STATE of Missouri, Respondent,

v.

Walter E. BARTON, Appellant.

No. 77147.

Supreme Court of Missouri,
En Banc.

Nov. 19, 1996.

Rehearing Denied Dec. 17, 1996.

J. Christopher Spangler, Sedalia, for Appellant.

Jeremiah W. (Jay) Nixon, Attorney General, David R. Truman, Assistant Attorney General, Jefferson City, for Respondent.

PRICE, Judge.

This is an appeal from a conviction for first degree murder. Because the trial court sustained an objection to defense counsel's closing argument, even though the argument was supported by facts and reasonable inferences in the record, and because the error was prejudicial, we reverse and remand for a new trial.

## I.

Appellant Walter Barton was charged with murder in the first degree for the October 9, 1991, murder of Gladys Kuehler. After a jury had been sworn in Henry County, it was discovered that the State failed to endorse any witnesses. A mistrial was granted on Barton's motion, but his request to be discharged was denied. The parties agreed to select a second jury from Cooper County, and a jury trial began on October 22, 1993. When it became apparent that the jury could not reach a verdict, a second mistrial was granted. A third trial began on April 11, 1994, in the Circuit Court of Christian County.

The prosecution's theory of the case was that Barton killed Mrs. Kuehler in her trailer home sometime between 3:00 and 4:00 in the afternoon. Mrs. Kuehler had been visited by Ted and Sharon Bartlett, former residents of the trailer park, until approximately 2:50. There was evidence that Barton was in the trailer home sometime between 3:00 and 3:30, and that he answered Mrs. Kuehler's phone during that time. The caller, prosecution witness Bill Pickering, testified that he called Mrs. Kuehler between 3:00 and 3:15. Mr. Pickering further testified that a man answered the phone and said Mrs. Kuehler was unavailable. Barton told a police officer that he was the man that answered the phone between 3:15 and 3:30. The prosecution also offered evidence that Mrs. Kuehler's granddaughter, Debbie Selvidge, called the mobile home "every hour on the hour" everyday. On cross-examination, Selvidge acknowledged that she called Mrs. Kuehler after 3:00 on the day of the murder and that she spoke to her for "at least twenty-five minutes."

Carol Horton, a witness for the prosecution, testified that Barton was with her in her trailer between approximately 3:30 and 4:00. Horton further testified that Barton seemed to be in a hurry when he returned from his 3:00 visit to Mrs. Kuehler's trailer home, and that he spent "a long time" washing his hands. The prosecution also put forth evidence that blood was found on Barton's clothing and boots and that the blood on his shirt belonged to Mrs. Kuehler. (According to Barton, the blood got on his clothes when he tried to pull Selvidge away from her grandmother after the body was discovered.) Finally, three jailhouse informants testified that while Barton was in jail he admitted to killing an old lady.

The defense put on evidence that a hair was found on Mrs. Kuehler's body that could not have belonged to her or to Barton. The defense also introduced evidence that blood was found under Mrs. Kuehler's fingernails that could not have come from Barton. Additionally, Danny Dowdy, a neighbor of Carol Horton, testified that he spoke to Barton shortly after 4:00 on the day of the murder. He said that he got a good look at the front of Barton's shirt and the front of his pants, but that he did not see any blood on Barton's clothes.

Defense counsel attempted to establish that Barton could not have committed the murder because he could not have been at the scene of the crime when the murder occurred. During closing, defense counsel argued:

> Walter Barton admitted that he answered the phone. He never tried to hide that. And you heard from the Pickerings that they were there and when they called back was between 3:00 and 3:15. Mr. Pickering is sure about the time being close.
>
> But you heard Debbie Selvidge say that she spoke to her grandmother that afternoon and she spoke to her for 20 to 25 minutes. If she'd spoke to her grandmoth-

er for 25 minutes at 3:00, Mr. Pickering would not have been able to get through. So we know that she spoke to her grandmother after Mr. Pickering had called.

At that point, the Prosecutor objected, stating: "Objection, your honor. There is *no such conclusion possible* from that evidence." That objection was sustained and defense counsel did not pursue that line of argument any further.

The jury found appellant guilty as charged and recommended the death penalty. The trial court sentenced Barton to death. Barton's motion for post-conviction relief under Rule 29.15 was overruled. Barton appealed the conviction and the denial of post-conviction relief to this Court.

## II.

Barton's first point on appeal is that the trial court abused its discretion in sustaining the prosecutor's objection to his closing argument. Barton asserts that the argument was proper because it was supported by evidence on the record and the reasonable inferences derived from that evidence. Barton further argues that this error caused him prejudice and requires reversal and a new trial. Because we find in favor of Barton on this issue, we do not address the other points raised.

## A.

■ A criminal defendant has the right to a fair and impartial trial. U.S. CONST. amend. VI; MO. CONST., art. I, § 18(a). The right to a fair trial demands a reasonable opportunity to present the defendant's theory of the case during closing argument. *Herring v. New York*, 422 U.S. 853, 860–61, 95 S.Ct. 2550, 2554–55, 45 L.Ed.2d 593 (1975); *State v. Williams*, 681 S.W.2d 948, 950 (Mo.App.1984). "It can hardly be questioned that closing argument serves to sharpen and clarify the issues for resolution by the trier of fact in a criminal case. For it is only

after all the evidence is in that counsel for the parties are in a position to present their respective versions of the case as a whole." *Herring, supra*, at 862, 95 S.Ct. at 2555. Closing arguments are particularly important in capital cases where there are unique threats to life and liberty.

■ Missouri law in this area is relatively clear. Trial courts have wide discretion in controlling the scope of closing argument. *State v. Lee*, 841 S.W.2d 648, 653 (Mo. banc 1992). Although courts are to be careful to refrain from unduly restricting closing arguments, they have the power to confine the arguments to issues raised by the pleadings and the evidence. *State v. Van Horn*, 288 S.W.2d 919, 922 (Mo. banc 1956). A party may argue inferences justified by the evidence, but not inferences unsupported by the facts. *State v. Richardson*, 923 S.W.2d 301, 314–15 (Mo. banc), *cert. denied*, —— U.S. ——, 117 S.Ct. 403, 136 L.Ed.2d 317 (1996).[1]

The law of other jurisdictions is in accord. The United States Court of Appeals for the District of Columbia, in *United States v. Sawyer*, 443 F.2d 712 (D.C.Cir.1971), stated that "[i]f the court prevents defense counsel from making a point essential to the defense," the court has abused its discretion. *Id.* at 713. The court further stated that, "The prosecutor and the defense counsel in turn must be afforded a full opportunity to advance their competing interpretations.... The court should exclude only those statements that misrepresent the evidence or the law, introduce irrelevant prejudicial matters, or otherwise tend to confuse the jury." *Id.* at 713–14. In *United States v. DeLoach*, 504 F.2d 185 (D.C.Cir.1974), the District of Columbia Circuit held that the trial court erroneously restricted defense counsel's argument when counsel was merely trying to draw reasonable inferences supported by the facts. *Id.* at 189–90 (citing *Sawyer, supra*, at 713–14). The court stated that "[a] trial judge may not impose on a jury his own

---

[1]. By implication, *Richardson* abandoned the more subjective standard of *State v. McDonald*, 661 S.W.2d 497 (Mo. banc 1983), *cert. denied*, 471 U.S. 1009, 105 S.Ct. 1875, 85 L.Ed.2d 168 (1985), which stated that a prosecutor "has the right to draw any inferences from the evidence which *he believes in good faith* to be justified." *Id.* at 506 (emphasis added).

notion of which inferences · are reasonable.... [D]efense counsel should have wide latitude in drawing inferences from the record." *Id.* at 190–91; *see also Ohio v. Pinkney,* 36 Ohio St.3d 190, 522 N.E.2d 555, 558 (1988); *Commonwealth v. Bennett,* 6 Mass.App.Ct. 832, 372 N.E.2d 271, 271–72 (1978).

■ The common thread running through all of these cases is that defense counsel has the right to make any argument to the jury that is essential to the defense of the accused and is justified by evidence and the reasonable inferences that might be drawn therefrom. It is an abuse of discretion for the trial judge to preclude any such argument. Accordingly, our task is to examine the closing argument attempted by defense counsel to determine if it was justified by the evidence.

### B.

■ Defense counsel argued the following facts:

Walter Barton admitted that he answered the phone. He never tried to hide that. And you heard from the Pickerings that they were there and when they called back was between 3:00 and 3:15. Mr. Pickering is sure about the time being close.

But you heard Debbie Selvidge say that she spoke to her grandmother that afternoon and she spoke to her for 20 to 25 minutes.

She then argued the inference or conclusion that:

If she'd spoke to her grandmother for 25 minutes at 3:00, Mr. Pickering would not have been able to get through. So we know that she spoke to her grandmother after Mr. Pickering had called.

The prosecutor objected that: "There is no such conclusion possible from that evidence." Contrary to the objection and the ruling of the trial court, a line by line review of the argument and the transcript reveals that there was evidence in the record to justify each statement of fact argued by defense counsel and that the final conclusion was possible.

1. "Walter Barton admitted that he answered the phone. He never tried to hide that."

Officer Jack Merritt, a sergeant with the Missouri Highway Patrol, testified that Barton answered the phone in Mrs. Kuehler's trailer when the Pickerings called:

Q. And what did you ask Mr. Barton if you remember?

A. The exact verbiage I don't recall. I asked him, "What time did you answer the phone in Gladys' trailer?" or something to that effect.

Q. And did you get a response?

A. I got an acknowledgment that he had answered the telephone.

Q. Did you get a time?

A. My recollection I believe that he did say around 3:30, 3:15 or 3:30. I don't recall exactly.

2. "And you heard from the Pickerings that they were there and when they called back was between 3:00 and 3:15. Mr. Pickering is sure about the time being close."

Mr. Pickering testified that, when he returned home, he called Mrs. Kuehler's trailer between 3:00 and 3:15:

Q. After you ate and drove home, did you take any efforts to try to contact Gladys Kuehler at some time later that afternoon.

A. Early in the day Gladys had called and said there was somebody interested in renting a trailer. So when I got home which was around 3:00 or 3:15 I called Gladys back.

Q. That's 3:00 or 3:15 p.m.?

A. Yes, sir.

Q. And did you reach Mrs. Kuehler?

A. I reached her residence. I did not reach her.

Q. Who did you speak with, if you know?

A. I do not know who it was. A man did answer the telephone.

3. "But you heard Debbie Selvidge say that she spoke to her grandmother that afternoon and she spoke to her for 20 to 25 minutes [after 3:00]."

On cross-examination, Debbie Selvidge testified that she spoke to Mrs. Kuehler on the telephone after 3:00:

Q. You also spoke to your grandmother after 3:00 o'clock that day, is that correct?

A. Yes.

Q. And when you spoke to your grandmother after 3:00 you talked to her at least 25 minutes?

A. I don't know how long it was, but we talked.

When confronted with prior deposition testimony, Selvidge acknowledged that she spoke to her grandmother for at least 25 minutes:

Q. I'm going to show you what's been marked Defendant's Exhibit A, which I believe is a copy of your deposition. I'm going to ask you to turn to page 10 and I'll ask you to look at line 18. I believe you were asked, "Do you remember how long you talked then?" And your answer was, "Not very long."

A. Right.

Q. The next question, "Okay, when you say not very long, what is not very long for you?" And you said, "Give or take about 20 minutes."

"Question: Okay, so you all might have spoken about 20 minutes?"

"Answer: Yeah, twenty-five.

"Question: Do you think you were off the phone by 4:00?

"Answer: Yeah, I know we were.

"Question: Then did you try to call her later after that?

"Answer: Yeah."

Q. So going back to the deposition that you gave in January of 1992, at that time under oath you stated that you believe that you had talked to your grandmother at least 25 minutes, is that correct?

A. Probably, yeah.

Q. After 3:00 o'clock?

A. Yeah.

4. "If she'd spoke to her grandmother for 25 minutes at 3:00, Mr. Pickering would not have been able to get through. So we know that she spoke to her grandmother after Mr. Pickering had called."

Analysis of the inference shows that it was justified by the evidence. If the jury believed Mr. Pickering, that he called Mrs. Kuehler between 3:00 and 3:15, and if the jury believed Ms. Selvidge, that she called her grandmother after 3:00 and spoke for at least 25 minutes, the jury would be forced to conclude that Mr. Pickering called first. Debbie Selvidge's call would have tied up Mrs. Kuehler's phone line and Mr. Pickering could not have gotten through, if the order of the calls were otherwise.

This conclusion is especially important to Barton. It necessarily places him at the crime scene only around 3:00, when he answered the phone call, with the murder occurring no earlier than 3:25, after Ms. Selvidge hung up the phone with Mrs. Kuehler. This would leave Barton with little or no time to dole out five blunt-force injuries to the victim's scalp; four blunt-force injuries to the face; thirty-eight stab wounds to the torso; and several slashes to the face and neck; sexually assault the victim; clean himself up; dispose of the murder weapon; and still walk back to Horton's trailer by around 3:30.

The argument by defense counsel obviously was essential to Barton's defense that he could not have committed the murder and still have been at Carol Horton's trailer by 3:30. It also was justified by the facts in the record. Therefore, the trial court abused its discretion by sustaining the state's objection and denying the defense this argument.

## C.

■ Even if an abuse of discretion is shown, an additional finding is required to justify reversal. We have used various terms to describe this finding. In *State v. Mahurin,* 799 S.W.2d 840, 844 (Mo. banc 1990), *cert. denied,* 502 U.S. 825, 112 S.Ct. 90, 116 L.Ed.2d 62 (1991), we stated that a conviction will not be reversed unless the abuse of discretion was "clearly injurious" to the defendant. In *State v. Newlon,* 627 S.W.2d 606, 616 (Mo. banc), *cert. denied,* 459 U.S. 884, 103 S.Ct. 185, 74 L.Ed.2d 149, *reh. denied,* 459 U.S. 1024, 103 S.Ct. 391, 74 L.Ed.2d 520 (1982), we stated that a "conviction will be reversed for improper argument only if it is established the complained of comments had a *decisive effect* on the jury's verdict." In *State v. Smith,* 756 S.W.2d 493, 498 (Mo. banc 1988), *cert. denied,* 488 U.S. 1019, 109 S.Ct. 823, 102 L.Ed.2d 812 (1989), we stated that "unless an abuse of discretion is demonstrated, to the *prejudice* of the accused, the case will not be reversed on appeal."

For all practical purposes, it appears that the terms "clearly injurious" and "decisive effect" are synonymous with the more familiar term "prejudice". For example, in *Mahurin* and in *State v. Hutchinson,* 458 S.W.2d 553 (Mo. banc 1970), this Court used the terms "prejudice" and "clearly injurious" interchangeably. In *Hutchinson,* we held, "We do not believe the 'trial court abused its discretion to the prejudice of appellant.' We do not believe the comments of the prosecutor were 'plainly unwarranted and clearly injurious.'" *Hutchinson, supra,* at 556 (quoting *Homan v. United States,* 279 F.2d 767, 776 (8th Cir.1960)).

Similarly, "decisive effect" and "prejudice" have been used interchangeably by the court of appeals. In *State v. Hurst,* 845 S.W.2d 669, 671 (Mo.App.1993), the terms were used interchangeably as the court pronounced, "We find prosecutor's brief remarks could not have elicited such prejudice so as to have a decisive effect on the case."

More importantly, "decisive effect" and "prejudice" have been defined in exactly the same manner. The Court of Appeals, Eastern District, in *State v. Roberts,* 838 S.W.2d 126, 132 (Mo.App.1992), defined "decisive effect" as "a reasonable probability that, in the absence of these comments, the verdict would have been different." The southern district adopted this standard in *State v. Pagano,* 882 S.W.2d 326, 334 (Mo.App.1994) (citing *Roberts, supra,* at 132); *see also State v. Mishler,* 908 S.W.2d 888, 894 (Mo.App. 1995). That standard is precisely the same standard expressed in *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984), as the definition for prejudice. There, the United States Supreme Court defined the "appropriate test for prejudice" by requiring the defendant to "show that there is a reasonable probability that, but for [the] errors, the result of the proceeding would have been different." *Id.* This Court has adopted that definition of prejudice, as well. *See, e.g., State v. Parker,* 856 S.W.2d 331, 333 (Mo. banc 1993) (defining "prejudicially affected" as "a reasonable probability that counsel's error affected the outcome of the trial"); *see also State v. Clemmons,* 753 S.W.2d 901, 911 (Mo. banc) ("The Court is convinced that there is no reasonable probability that the jury would have reached a different sentencing ...."), *cert. denied,* 488 U.S. 948, 109 S.Ct. 380, 102 L.Ed.2d 369 (1988); *State v. Weaver,* 912 S.W.2d 499, 514–15 (Mo. banc 1995) ("A [Brady] due process violation occurs 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" (quoting *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985))), *cert. denied,* —— U.S. ——, 117 S.Ct. 153, 136 L.Ed.2d 98 (1996).

Because the use of three different terms might lead to confusion, the proper standard for reversing a case due to an abuse of discretion in closing argument should be stated as whether the abuse "prejudiced" the defendant's case; that is, whether there is a reasonable probability that, in the absence of the abuse, the verdict would have been different.

The vast majority of case law in Missouri has resolved this issue in favor of a finding of no prejudice because of overwhelming evidence against the defendant. *See, e.g., Hurst, supra* (holding that prosecutor's error in closing argument did not require reversal because evidence against defendant was overwhelming); *Roberts, supra* (holding that prosecutor's misconduct was not grounds for reversal because challenged comments did not have a decisive effect on the jury's verdict in light of overwhelming evidence against the defendant). This case, however, is one where a reasonable probability exists that the jury would have reached a different result.

■ The state produced ample evidence to support the guilt of Barton. Barton answered Mrs. Kuehler's phone between 3:00 and 3:15. Barton was the last known person to be at Mrs. Kuehler's trailer before her death. Blood from Mrs. Kuehler was found on Barton's shirt and shoes. Three individuals testified that, while he was in jail, Barton admitted that he had killed an old woman.

Barton's counsel, however, presented arguments in response to the above evidence that the jury might have believed. She argued that Barton had gotten small amounts of Mrs. Kuehler's blood on himself later, after the body was found. She further argued that had Barton killed Mrs. Kuehler, he would have had substantially more of her blood on him. She argued that it was particularly significant that no blood was found on Barton's pocket knife or wrist watch, items where blood would have been expected to be found and that would have been hard to clean. Barton also had been seen by Danny Dowdy at approximately 4:00, between the time he had left Mrs. Kuehler's trailer and the time her body was found. Dowdy testified that he was close enough to get a good look at Barton, but did not notice any blood on his clothes.

As to the individuals claiming that Barton had told them that he had killed an old woman, defense counsel argued that they were all "jail house snitches" who expected favorable treatment from the state in exchange for their testimony. She further presented evidence that one of the individuals, Larry Arnold, had "made a deal" to testify for the prosecution in four previous cases, had been convicted himself four or five times for burglary, stealing, and murder, and admitted that he had lied to a jury before in the very same courtroom. Counsel for defendant also charged one of the individuals, Craig Dorser, with being subject to pending burglary and unlawful use of a weapon charges, and with being convicted previously of misdemeanor stealing.

Finally, Barton's counsel had introduced evidence that a hair found on Mrs. Kuehler's body could not have come from Barton, and that blood found under Mrs. Kuehler's fingernails could not have been Barton's. Both pieces of evidence obviously are exculpatory and indicate that another person might have committed the crime.

The closing argument attempted by defense counsel, in this regard, could have been decisive, if the jury believed the time evidence favorably to Barton. Debbie Selvidge called her grandmother around 3:00 and spoke to her for 25 minutes. Because Pickering testified that he called between 3:00 and 3:15, he must have called before Ms. Selvidge. Therefore, when Barton was at Mrs. Kuehler's trailer, she was alive and well. Further, with Selvidge speaking to her grandmother on the phone until 3:25, the jury could have found that there was not enough time for Barton to have committed this brutal and bloody murder, clean himself, dispose of the weapon, and then walk to Carol Horton's trailer by 3:30.

While the jury certainly might have rejected this time line and found the facts consistent with Barton's guilt, they were not compelled to do so. Barton's argument was supported by the evidence, supported by other exculpatory evidence, and there is a reasonable probability that it would have caused a different jury verdict. In fact, at a prior trial, the jury was unable to reach agreement on a guilty verdict for Barton.

The actual language of the objection, "There is *no such conclusion possible* from that evidence," is even more troublesome. By sustaining the objection, the judge not only precluded the defense from driving the point home, but effectively gave the prosecutor's statement, that the defense's argument was impossible, the court's stamp of approval. *See, e.g., Bollenbach v. United States,* 326 U.S. 607, 612, 66 S.Ct. 402, 405, 90 L.Ed. 350 (1946) (" 'The influence of the trial judge on the jury is necessarily and properly of great weight,' and jurors are ever watchful of the words that fall from him." (quoting *Starr v. United States,* 153 U.S. 614, 626, 14 S.Ct. 919, 923, 38 L.Ed. 841 (1894))); *State v. Gonzalez,* 899 S.W.2d 936, 937 (Mo.App.1995) ("Defendant's motion to strike the improper argument, however, was overruled. So far as the jury was informed, the argument had the court's approval.").

In this case, the judge's stamp of approval effectively precluded the jury from reaching the conclusion that Selvidge spoke to the victim after Mr. Pickering called. Barton's defense relied on the inference that Mrs. Kuehler was alive and well, speaking on the phone to her granddaughter, for at least 25 minutes of the 30 minutes that Barton could have been at the crime scene and the related inference that he could not have murdered Mrs. Kuehler, cleaned up, and traveled the short block in the remaining five minutes before he returned to Carol Horton's trailer.

We find that there is a reasonable probability that, in the absence of the abuse of discretion, the verdict would have been different. Therefore, Barton was prejudiced by the trial court's abuse of discretion.

## III.

This case is reversed and remanded for a new trial.

HOLSTEIN, C.J., COVINGTON, and WHITE, JJ., concur.

LIMBAUGH, J., dissents in separate opinion filed.

BENTON and ROBERTSON, JJ., concur in opinion of LIMBAUGH, J.

LIMBAUGH, Judge, dissenting.

I respectfully dissent. Although I agree that the trial judge erred by sustaining the State's objection to a conclusion made by defense counsel in closing argument, I would hold that the error was not so prejudicial as to warrant a new trial.

Despite its acknowledgment of "ample evidence" to support the verdict of guilty, the majority holds that there would have been a "reasonable likelihood" of a verdict of not guilty had the objection to defense counsel's time line argument been overruled. To arrive at that holding, the majority necessarily finds that a reasonable likelihood exists not only that the jury would have agreed with defense counsel's hotly contested conclusion about the time line evidence, but also that the jury would have disbelieved the State's potent blood and confession evidence. The record simply does not support that conclusion. In finding prejudicial error, the majority has misapplied the "reasonable likelihood" standard so that reversal is triggered not by the reasonable likelihood of a different result but rather by the mere possibility of a different result.

This misapplication is due, in large part, to the majority's focus on a single, isolated ruling in closing argument, as if it was the turning point of the trial, to the exclusion of the closing argument as a whole. In the recitation of the facts, the majority neglected to divulge the comment made by defense counsel to the jury immediately after the objection in question was sustained. Defense counsel stated: "Between the twelve of you you will remember the evidence. You will be able to put the times." To this statement there was neither objection from the prosecutor nor admonition from the judge. As such, defense counsel was able to rehabilitate the argument that the time line evidence showed that it was extremely unlikely that defendant was present when the murder was committed and that the prosecutor, at the very least, was having to stretch the time line evidence to implicate the defendant.

In addition, the majority disregards the fact that pursuing the time line defense was

not defense counsel's predominant strategy. In fact, the 21–page transcript of defense counsel's closing argument contains just one-half page on the time line argument. Instead, defense counsel concentrated almost exclusively on the two major efforts of the defense: 1) to rebut the evidence of the victim's blood on the defendant's clothing; and 2) to rebut the testimony of three inmates to whom the defendant had supposedly confessed. Except for the objection in question, defense counsel was not prohibited from pursuing the time line argument more fully, but instead chose to pursue what were apparently thought to be more compelling arguments. That strategy makes sense because, as the prosecutor aptly pointed out in his own closing argument, the time line evidence benefits the State at least as much, if not more, than it benefits the defendant. By all accounts, that evidence places the defendant in the victim's apartment at or within just a few minutes of the time the murder had to have occurred. Moreover, given the short time period involved, between 3 to 3:15 P.M. and 4 P.M., and in view of the evidence that the murderer took sufficient time to stab the victim 37 times, cut her throat, carve Xs on her torso and then wash up in the bathroom, it is hardly conceivable that anyone but the defendant could have committed the crime.

In applying the reasonable likelihood standard, the majority also discounts the strength of the State's case and gives too much credence to the evidence presented by the defendant. As noted, the State's evidence placed the defendant in the victim's apartment at or near the time the murder occurred, showed conclusively that the victim's blood was found on the defendant's clothing, and established that defendant confessed to three other inmates. In most cases, this evidence would be characterized as overwhelming. According to the majority, however, the defendant effectively diluted the State's case, not only by his own interpretation of the time line evidence, but also by explaining that the bloodstains on his clothing resulted from his presence at the scene of the crime after the body was discovered, and by impeaching the credibility of the three inmates with evidence of their prior offenses and the prospect of more lenient punishment.

In my view, the impact of defendant's arguments, especially on the blood evidence, would have been slight. As discussed above, the time line evidence plays better for the State than the defendant. Furthermore, defendant's explanation for the blood on his clothing is far-fetched at best. Blood stains were found on defendant's shirt as well as his jeans, and a droplet of blood had spattered on one of his boots. According to defendant's own account, he came into contact with the victim's blood by doing nothing more than pulling the granddaughter, Ms. Selvedge, away from her grandmother's body as it laid on the bedroom floor. Significantly, the defendant leaves unanswered the question why Ms. Selvidge, the person closest to the body and the one most likely to have blood on her clothes, had none at all! Finally, the impeachment of the three inmates was offset by their testimony about peculiar details of the crime that they could not realistically have obtained from any source other than the defendant himself.

On this record, it is unreasonable to conclude that the case turned on the trial court's ruling in closing argument. To reiterate: 1) defense counsel was able to make the point about the time line evidence despite the court's ruling and, in any event, the primary key to the defense was to refute the blood and confession evidence rather than to press the time line argument; and 2) the overall strength of the State's case would have won the day even if the error in closing argument had not occurred.

For these reasons, I dissent.