

# Missouri Court of Appeals
## Western District

| | | |
|---|---|---|
| **STATE OF MISSOURI,** | ) | |
| | ) | **WD85181** |
| Respondent, | ) | |
| **v.** | ) | **OPINION FILED:** |
| | ) | |
| **AASIM I. KARIM,** | ) | **March 12, 2024** |
| | ) | |
| Appellant. | ) | |
| | ) | |

**Appeal from the Circuit Court of Jackson County, Missouri
The Honorable Bryan Round, Judge**

**Before Division One:  Alok Ahuja, Presiding Judge,
Cynthia L. Martin, Judge, and Thomas N. Chapman, Judge**

Aasim Karim ("Karim") was convicted of first-degree murder and armed criminal action following a jury trial in the Circuit Court of Jackson County.  Karim raises two points on appeal.  In his first point, he argues that the trial court erred in excluding evidence.  In his second point, he argues that the trial court erred in sustaining an objection that prevented him from arguing his defense theory during closing argument. The judgment is affirmed.

## Background[1]

Karim and Victim were neighbors. In late December and again in early January of 2018, Karim told multiple people that he had been having problems with Victim and had threatened to kill Victim if the problems did not stop. On the night of January 4, 2018, a work van driven by Victim crashed into a utility pole on 40 Highway after Victim suffered a gunshot wound to the face while driving.

A nurse who was driving on Highway 40 saw the wrecked van with smoke coming out of it and stopped to provide assistance. The nurse called 911, then approached the van. She saw the driver slumped in the driver's seat and noticed the tires of the van were still spinning which led her to believe the driver's foot was on the gas. The nurse did not realize that the driver had been shot. The nurse noticed a Metro bus on the opposite side of the road as well as some people standing around. The nurse noticed a man appear at the scene who appeared to be an acquaintance of the driver, as the man was calling out a first name. The man helped the nurse get the driver out of the vehicle so that the nurse could attempt to administer C.P.R. As the nurse attempted to administer C.P.R. to Victim, the man yelled for the nurse to stop because the efforts were causing Victim to bleed a lot from what appeared to be Victim's neck. The nurse stopped her efforts. Eventually,

---

[1] On appeal, Karim does not challenge the sufficiency of the evidence supporting his convictions. In criminal cases, we view the evidence in the light most favorable to the verdict. *State v. Campbell*, 600 S.W.3d 780, 784 n.1 (Mo. App. W.D. 2020) (citing *State v. Brand*, 309 S.W.3d 887, 890 n.2 (Mo. App. W.D. 2010)).

2

E.M.S. arrived and cleared the area. The nurse waited for a couple of hours to speak with detectives and provided a DNA sample.[2]

Officers with the Kansas City Police Department processed the scene upon arriving. Victim had suffered a gunshot wound to his left cheek that caused his death. A spent .40-caliber shell casing was found in the street near the van.

A truck driver who was on his way to work witnessed the van crash into the pole. The driver saw a vehicle that was either a PT Cruiser or a Chevy HHR straddling the striped line and driving very close to a white work van. It looked to the truck driver that the cars were possibly close enough to be touching. As the truck driver passed the cars, he noticed the white van jump the curb and hit a light pole; he noticed the other vehicle "took off and went on up the street." The truck driver noted that the dark car was definitely involved in the crash.

During a subsequent investigation, detectives were able to recover surveillance video from a shop and a night club on Highway 40. The footage showed Victim's van pass by, followed thereafter by a dark vehicle that resembled a PT Cruiser or HHR. The dark vehicle passed by the location where the van crashed into the utility pole a few seconds after the crash.

---

[2] The man, later identified as M.P., did not wait at the scene to speak to police that night. However, M.P. contacted police the next day, identified himself as a friend of Victim, participated in an interview, and provided a DNA sample to police.

Police surveilled Karim's residence, which had a black HHR parked outside. Karim and another man, later identified as S.J., left in the vehicle. Police conducted a stop of the vehicle. A search of Karim revealed that Karim had a .40-caliber magazine filled with live ammunition in his pocket. Karim was arrested and his DNA was collected. The HHR was later searched at a secure tow lot. A Bursa .40-caliber pistol was found on the floorboard under the driver's side seat. A rental agreement in Karim's name was in the glove box.

Karim's DNA was found on the trigger of the pistol recovered under the driver's seat of his vehicle. The shell casing found at the crime scene was fired from the pistol found in Karim's vehicle.

A search of Karim's residence was conducted. Live rounds of .40-caliber ammunition were found throughout the house. Spent .40-caliber shell casings were found outside the back door of the residence. Subsequent tests indicated that the shell casings recovered from Karim's residence were fired from the pistol found in Karim's car.

The jury found Karim guilty on the charges of first-degree murder and armed criminal action. Karim now appeals to this court.

**Analysis**

Karim raises two points on appeal. In his first point, he argues that the trial court erred in excluding evidence. In his second point, he argues that the trial court erred in preventing him from arguing his defense theory during closing argument. We address

4

these points in turn after first addressing a preservation issue with respect to the timeliness of Karim's motion for new trial.

## Timeliness of Karim's Motion for New Trial

In jury-tried cases, allegations of error must be included in a motion for new trial in order to preserve such allegations of error for appellate review, with limited enumerated exceptions not relevant to Karim's points on appeal. *See* Rule 29.11(d). Rule 29.11(b) provides that a motion for new trial must be filed within fifteen days after the return of the verdict. Rule 29.11(b) further provides: "On application of the defendant made within fifteen days after the return of the verdict and for good cause shown the court may extend the time for filing of such motions for one additional period not to exceed ten days."

In this matter, the jury returned its verdict on November 15, 2021. The record indicates that Karim's motion for new trial was filed on December 10, 2021. Thus, Karim's motion for new trial was filed twenty-five days after the return of the verdict. There is no indication in the record that Karim made an application for an extension of time for the filing of his motion for new trial. An untimely motion for new trial is "a nullity and preserves nothing for appellate review." *State v. Vandergrift*, 669 S.W.3d 282, 293 (Mo. banc 2023) (citation and brackets omitted). As relevant, Rule 84.04(e) provides that, for each claim of error, an appellant's brief shall include in the argument section "a concise statement describing whether the error was preserved for appellate review; if so, how it was preserved; and the applicable standard of review." Karim's preservation

statements included the assertion that Karim's claims were included in a timely motion for new trial; however, his motion for new trial was not filed within fifteen days of the return of the verdict. Karim's briefing does not allege that an extension was timely requested or granted, and the record does not indicate that an extension was timely requested or granted. Thus, based on the record before us, Karim's motion for new trial was untimely and preserved nothing for appeal. Rule 30.20 provides that "plain errors affecting substantial rights may be considered in the discretion of the court when the court finds that manifest injustice or miscarriage of justice has resulted therefrom."

Because we find that Karim has failed to establish error – plain or otherwise – in his two points on appeal, our analysis of those points does not include a separate plain error analysis independent of the standards for preserved error as recited below.

### Point One

In his first point on appeal, Karim argues that the trial court abused its discretion in excluding evidence about threats made by Victim's girlfriend, V.S., against Victim, prior instances of violence by V.S. against Victim, and financial benefits gained by V.S. from Victim's death. Karim argues that the exclusion of such evidence prejudiced Karim.

"Trial courts have broad discretion to admit or exclude evidence, and reversal is warranted only when there is a clear abuse of discretion." *State v. Hunt*, 451 S.W.3d 251, 263 (Mo. banc 2014) (citing *State v. Shockley*, 410 S.W.3d 179, 195 (Mo. banc 2013)). "To preserve a claim of improperly excluded evidence, the proponent must attempt to present the excluded evidence at trial and, if it remains excluded, make a sufficient offer

of proof." *Id.* (citing *Hancock v. Shook*, 100 S.W.3d 786, 802 (Mo. banc 2003)). "The purpose of an offer of proof is to preserve the evidence so the appellate court 'understands the scope and effect of the questions and proposed answers.'" *Id.* (quoting *State v. Tisius*, 92 S.W.3d 751, 767-68 (Mo. banc 2002)). "Offers of proof must show what the evidence will be, the purpose and object of the evidence, and each fact essential to establishing admissibility." *Id.*

After the State rested and prior to the presentation of the defense case, there was discussion regarding the anticipated testimony of defense witness C.C. The State indicated that it was concerned about Karim attempting to present third party evidence to attempt to blame others for the crime without a sufficient evidentiary nexus. Karim argued that M.P. was present at the scene of the crime, which constituted a sufficient nexus. Karim argued further that C.C. would provide testimony that M.P. and S.J. knew each other and had a conversation with V.S. (Victim's girlfriend). Karim argued that S.J. was in the vehicle with Karim when Karim was arrested and that it was reasonable to infer that S.J. planted the gun in Karim's car while Karim was being arrested but before the vehicle was towed to the secure lot. The trial court indicated that it would allow C.C. to testify about things that she observed or things she knew, such as whether M.P. and S.J. knew each other, but that the trial court would not allow C.C. to "answer questions about what she thinks she knows."

7

C.C. testified that she was the live-in girlfriend of M.A., who was Victim's landlord and boss.[3] She testified that she lived near Victim and had known Victim for many years; and that she also knew V.S., who was Victim's live-in girlfriend. C.C. testified that she was familiar with Karim, but did not know him by name, and that Karim lived behind Victim's house in close proximity. C.C. further indicated that Karim lived in the neighborhood for two or three years and that Karim would sell pit bulls and salvageable items like appliances, and that Karim had sold a pit bull to Victim.

Defense counsel then asked C.C. whether Victim and his girlfriend, V.S., had a turbulent relationship. The State objected as to relevance. During a discussion at the bench, the trial court asked why that information would be relevant. Defense counsel indicated that he thought it would be relevant once C.C. disclosed what she witnessed. The State's objection was sustained. Defense counsel then asked C.C. if she heard Victim's girlfriend, V.S., threaten to kill Victim a few days before Victim's death. The State objected on the grounds of hearsay and that C.C.'s answer would involve pure speculation on her part. Defense counsel argued that it was the same type of evidence that had been used against Karim. The trial court sustained the objection.

C.C. then testified that, on the night of Victim's death, Victim's girlfriend, V.S., called C.C. and said that Victim had gotten into a wreck and died. C.C. testified that she

---

[3] M.A., Victim's landlord, had previously testified that he and Victim had an arrangement under which Victim would perform work on M.A.'s house in exchange for M.A. allowing Victim to live in the house without paying rent. Victim also performed other construction-type work for M.A. in addition to performing work on the house in which Victim lived.

then went to V.S.'s home, and that V.S. told C.C. that M.P. (an acquaintance of both Victim and V.S.) had told V.S. that Victim had died in a wreck. C.C. testified that police were arriving at V.S.'s house around the time that C.C. arrived; and that V.S. and V.S.'s mother (who also lived in the home) and three other people C.C. did not know (a woman and two men) were at the house.

C.C. testified that, on the night of the Victim's death, V.S.'s demeanor was like nothing had happened. C.C. testified that V.S. spoke with the police in the other room and began to testify as to that conversation. The trial court sustained a hearsay objection by the State. C.C. testified that, as the police spoke with V.S. in the kitchen, C.C. stayed in the living room and witnessed the three other people (who she did not know) handing around a handgun and talking about getting rid of the gun.

C.C. also testified that, about two weeks before Victim's death, Karim told C.C. that Victim needed to stop doing what he was doing or Karim would kill Victim. C.C. indicated that she never discussed Karim's threat with Victim.

C.C. testified that she saw S.J. and M.P. at V.S.'s house two days after Victim's death, and that she had never seen S.J. there before that. C.C. testified that she saw V.S., M.P., and S.J. have a conversation on V.S.'s porch.

C.C. testified that Victim's girlfriend, V.S., continued to live in the house after Victim's death, and that Victim's best friend moved in to the house as well. C.C. testified that V.S. did not pay any rent, and that M.A. (who was C.C.'s significant other and the landlord of Victim and V.S's home) had to eventually ask V.S. to move out.

9

Defense counsel asked C.C. whether victim's girlfriend, V.S., had anything to gain by Victim's death. The state objected that C.C. was speculating. The trial court sustained the objection.

During an offer of proof, C.C. testified that V.S. threatened to kill Victim all the time and threatened to burn the house down with Victim in it. When asked about whether Victim and V.S. had a turbulent relationship, C.C. indicated that Victim and V.S. had an open relationship. When asked what V.S. would have to gain from Victim's death, C.C. testified that V.S. wanted the house that was owned by M.A. (C.C's significant other and Victim and V.S.'s landlord), and that V.S. felt like M.A. should also supply V.S. with a vehicle.

On appeal, Karim argues that the trial court abused its discretion in excluding testimony from C.C. because the evidence satisfied the "direct connection rule" for evidence relating to a third person's guilt.[4] The State argues that Karim's claim is not

---

[4] The Missouri Supreme Court has described the "direct connection rule" as follows:

> To be admissible, evidence that another person had an opportunity or motive for committing the crime for which a defendant is being tried must tend to prove that the other person committed some act directly connecting him with the crime. The evidence must be of the kind that directly connects the other person with the *corpus delicti* and tends clearly to point to someone other than the accused as the guilty person. Disconnected and remote acts, outside the crime itself cannot be separately proved for such purpose; and evidence which can have no other effect than to cast a bare suspicion on another, or to raise a conjectural inference as to the commission of the crime by another, is not admissible.

*State v. Nash*, 339 S.W.3d 500, 513 (Mo. banc 2011) (quoting *State v. Rousan*, 961 S.W.2d 831, 848 (Mo. banc 1998)).

> Generally, a defendant may introduce evidence tending to show that another person committed the offense, if a proper foundation is laid, unless the probative value of the evidence is substantially outweighed by its costs (such as undue

10

preserved for appeal because Karim failed to challenge on appeal the trial court's reason for excluding the evidence.[5] The State argues that the State's actual objection at trial was that the testimony of C.C. about what C.C. had heard V.S. say was hearsay, and that the trial court sustained this objection. The State points out that Karim does not raise a point on appeal that asserts error in the trial court's determination that the testimony was hearsay. We agree that Karim does not challenge the trial court's reason for excluding the evidence, thus failing to preserve his first point for appeal. Additionally, Karim makes no attempt to establish why C.C.'s testimony regarding V.S.'s potential motives for killing Victim would be admissible.

It is axiomatic that, in order to establish a trial court erred in excluding evidence, a party must establish on appeal that the evidence is admissible. By failing to present on appeal any arguments whatsoever regarding the trial court's reasons for sustaining the objections to C.C.'s testimony, Karim's appeal fails to establish error – plain or otherwise – in the exclusion of the evidence.

Karim's first point is denied.

---

delay, prejudice or confusion). When the evidence is merely that another person had opportunity or motive to commit the offense, or the evidence is otherwise disconnected or remote and there is no evidence that the other person committed an act directly connected to the offense, the minimal probative value of the evidence is outweighed by its tendency to confuse or misdirect the jury.
*State v. Bowman*, 337 S.W.3d 679, 686 (Mo. banc 2011) (internal citations and quotations omitted.

[5] The State did not on appeal make an argument regarding the timeliness of Karim's motion for new trial.

**Point Two**

In his second point, Karim argues that the trial court abused its discretion in sustaining an objection made by the State and preventing Karim from arguing his defense theory that M.P. and S.J. killed Victim at the behest of V.S.

"Trial courts have wide discretion in controlling the scope of closing argument." *State v. Barton*, 936 S.W.2d 781, 783 (Mo. banc 1996). "Although courts are to be careful to refrain from unduly restricting closing arguments, they have the power to confine the arguments to issues raised by the pleadings and the evidence." *Id.* (citation omitted). Generally, "defense counsel has the right to make any argument to the jury that is essential to the defense of the accused and is justified by evidence and the reasonable inferences that might be drawn therefrom." *Id.* at 784.

Prior to closing argument in this matter, the State requested that the trial court limit defense arguments that a third person committed the murder of Victim or that V.S. had threatened Victim's life. Defense counsel stated that it would not be arguing that V.S. made threats toward Victim because that evidence had been excluded. Regarding M.P., defense counsel argued that it was reasonable to infer that M.P. was involved in Victim's death because he was present at the scene of the crime. Regarding S.J., defense counsel argued that S.J. was in Karim's car when Karim was arrested and therefore S.J. had the opportunity to plant the gun under the driver's seat. The State argued that there was insufficient evidence that either M.P. or S.J. committed an act directly connecting either

12

M.P. or S.J. to the crime. After discussion, the trial court indicated that it would not allow argument that M.P. or S.J. killed Victim.

During closing argument, defense counsel argued that the car seen following Victim was not Karim's car and that due to the angle of the bullet, that whoever shot Victim did so from inside of Victim's van. Defense counsel argued that M.P. was more than likely the person who shot Victim from inside the van. The State objected. The trial court overruled the objection. Defense counsel then continued to make arguments that M.P. was the person who shot Victim, due to M.P.'s presence on the scene after the crash. Defense counsel argued that M.P. pretended to be concerned about Victim because the nurse arrived and that M.P. would have fled the scene if he had not been seen. Defense counsel argued that M.P. did not stay on the scene to speak to detectives because he had a gun on his person and was the real killer. Defense counsel argued that Karim was simply a convenient scapegoat for Victim's girlfriend, V.S., to make a suspect. Defense counsel argued that C.C. testified that she saw a young man and woman in V.S.'s living room with a handgun while V.S. was in the other room speaking with police and that M.P. had previously been to V.S.'s residence that evening after Victim's death. Defense counsel argued that M.P. dropped a gun off at V.S.'s residence and then fled before police arrived.

Defense counsel then began to argue that M.P.'s nickname was "Bike" because M.P. rode his bike everywhere. Defense counsel then began to make an argument regarding the fact that M.P. rode a bike everywhere. The State then asked to approach the bench and wished to renew its objection that it had made previously regarding the

13

defense presenting the theory of M.P. or S.J. committing the murder. The trial court began to address defense counsel and stated that the issue had previously been discussed. Defense counsel interrupted the trial court and began to argue that C.C. had testified that M.P. always rides his bike. The trial court replied that riding a bike did not directly link M.P. to the murder, and sustained the objection.

Defense counsel then argued to the jury that the fact that M.P. was known to ride a bike indicated that the only way M.P. could have gotten to the area where Victim was shot was by hiding in Victim's van. Defense counsel then argued that C.C. had testified that V.S. did not have a reaction upon learning of Victim's death. Defense counsel then argued that M.P. and S.J. were seen by C.C. at V.S.'s house a couple of days later. Defense counsel argued that S.J. was in the car with Karim when Karim was arrested, but that S.J. was let go.

Defense counsel argued that Karim was known to deal with salvaged goods and that the magazine in Karim's possession at the time of his arrest did not match the gun that was later found under the driver's seat of Karim's car because the gun found under the driver's seat of Karim's car had a magazine in it. Defense counsel argued that the various kinds of ammunition found at Karim's house indicated that Karim made a living buying and selling guns.

Defense counsel argued that S.J. was at Karim's house earlier on the day that Karim was arrested because S.J. was attempting to sell Karim the gun that was found in Karim's car, and that S.J. and Karim were going to a convenience store when they were

14

stopped by police so that Karim could get money with an ATM card that was found in Karim's car. The State objected that there was no evidence of an ATM card being found. Defense counsel argued that an ATM card was found and that it was a reasonable inference from the evidence. The trial court sustained the objection.

Defense counsel then argued that there was DNA evidence from Karim on the gun but argued that the forensic analyst also noted that there was DNA evidence from three other people on the gun from which profiles were not able to be developed. Defense counsel argued that, even though M.P. had voluntarily submitted a DNA sample to police, forensics were not able to compare his DNA with the other three DNA profiles on the gun.

Defense counsel then pointed out that S.J. was with Karim when Karim was arrested and that the police did not get a statement from S.J. after the gun was later found upon a search performed at the secure tow lot. Defense counsel argued that the police work in the case was "shoddy" and that the police never confirmed that Victim's blood was the blood that was found on the road. The State then objected, pointing out that proving that the blood on the road was not an element of the crimes and that the trial court had previously granted a motion in limine to prevent defense counsel from discussing untested evidence. The trial court instructed defense counsel that he was not to talk about evidence that had not been tested because that is what the law requires. Defense counsel replied that "the law is wrong." The trial court replied that State's objection was sustained.

15

Defense counsel then argued to the jury that the government should dot all the i's and cross all the t's when someone's freedom is at stake and argued that the government did not do so in this case. Defense counsel then argued that the government "didn't do their jobs" and that the jury should not let the government get away with it.

Defense counsel then argued that the police only investigated Karim and did not interview S.J. Defense counsel argued that V.S. should have been a suspect because she was Victim's significant other. Defense counsel argued that V.S. was not upset after Victim's death and that she should have been a suspect.

Defense counsel then argued that S.J. planted the gun found under the driver's seat of Karim's vehicle. Defense counsel then argued that the gun found in Karim's car (from which the bullet casing found at the crime scene was fired) was not the murder weapon. Defense counsel then argued that the police had tunnel vision, that Karim did not commit the crime, and that Karim's guilt had not been proven beyond a reasonable doubt.

As readily apparent by the contents of Karim's closing argument, the trial court gave Karim wide latitude to argue his various defense theories even though the trial court had indicated prior to closing argument that it believed the arguments to be improper. Although the trial court had indicated that it would limit the defense's ability to argue that M.P. or S.J. killed Victim because the trial court did not believe that there was a direct connection between M.P. or S.J. to the crime, the trial court then allowed Karim to argue that M.P. killed Victim and that S.J. planted the gun that was found in Karim's car

16

with Karim's DNA on it. Karim was further allowed to cast aspersions on V.S. during closing argument and argue that she should have been the police's primary suspect.

On appeal, Karim argues that the trial court erred in sustaining an objection to Karim's closing argument, but Karim fails to point to where in the record the defense attempted to make an argument but was prevented by the trial court. In fact, the trial court overruled the State's objection to defense counsel arguing that M.P. hid in Victim's van and shot Victim. On appeal, Karim appears to argue that he was prevented from arguing that his theory of defense was that V.S. was involved in a conspiracy with M.P. and S.J. to kill Victim so that V.S. could live rent free in M.A.'s house; however, the evidence at trial was that the reason V.S. had been living rent free in M.A.'s house prior to Victim's death was because Victim covered the rent by performing work for M.A. In any case, Karim was allowed to argue that V.S. had motive to kill Victim based on the rent arrangement and that she should have been the primary suspect in the police investigation.

Because we find that the trial court did not commit error – plain or otherwise – in limiting Karim's closing argument, but instead gave Karim wide latitude to argue his various defense theories, Karim's second point on appeal is denied.

**Conclusion**

The judgment is affirmed.

_____
Thomas N. Chapman, Judge

All concur.