

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | |
|---|---|
| STATE OF MISSOURI, | ) |
| | ) |
| Respondent, | ) |
| | )   **WD78417** |
| v. | ) |
| | )   **OPINION FILED:** |
| | )   **July 26, 2016** |
| LONNY LEROY MAYS, | ) |
| | ) |
| Appellant. | ) |

### Appeal from the Circuit Court of Benton County, Missouri
### The Honorable Mark B. Pilley, Judge

**Before Division IV:** Alok Ahuja, Presiding Judge,
Mark D. Pfeiffer, Chief Judge, and J. Dale Youngs, Special Judge

Mr. Lonnie Mays ("Mays") appeals the judgment of the Circuit Court of Benton County, Missouri ("trial court"), convicting him, after a jury trial, of one count of first-degree murder and one count of armed criminal action. On appeal, Mays claims that the trial court erred in refusing to exclude the testimony of a witness due to the clergy-communicant privilege and in refusing to suppress evidence found in his vehicle that he claims was obtained in violation of the Fourth Amendment. We affirm.

Mays and his wife lived in a retirement community called Sky Village, which is located near the junction of the Henry and Benton County lines. On the morning of March 26, 2012, Carolyn Simmons, who lived across the street from Mays, was putting her trash out when Mays, began "holler[ing] some things" at her; he appeared to be "a little irate." Ms. Simmons ignored Mays and went on to the house of another neighbor, Jeannie Fair, for coffee. Ms. Fair lived two houses down from Ms. Simmons. Also joining the coffee group was Rudy Romdall, who had had numerous run-ins with Mays over the years.

After coffee, Mr. Romdall followed Ms. Simmons back to her house in his gray pickup truck, because Mr. Romdall was going to accompany Ms. Simmons, who was head of the Sky Village community association, to meet a man delivering gravel for the community's streets. As they were leaving Ms. Simmons's house, Mays was in the middle of the street yelling at them, so Ms. Simmons told Mr. Romdall to exit the neighborhood in the direction opposite Mays. They did, but Mays followed them in his own black pickup truck. Ms. Simmons and Mr. Romdall parked just outside of the Sky Village community to wait for the gravel delivery person, and Mays stopped his truck in front of them on the road, got out of his truck, and started yelling, knocking on Mr. Romdall's truck window, and gesturing for Mr. Romdall to roll down his window. Ms. Simmons asked Mr. Romdall to ignore Mays because she was afraid. They ignored Mays, and he got back into his truck and drove away. Several minutes later, Mays again drove by Mr. Romdall and Ms. Simmons, gave them a dirty look, and drove away. Ms. Simmons did not see Mays again that day. After finishing with the gravel delivery person, Ms. Simmons and Mr. Romdall returned to the Sky Village community where one neighbor had

---

[1] In an appeal from a jury-tried case, we view the facts in the light most favorable to the jury's verdict. *State v. Ramirez*, 447 S.W.3d 792, 794 n.1 (Mo. App. W.D. 2014).

called the police to tell them about Mays's behavior.  The police came out to speak to them, and then went to the Mays house to speak to Mays.

At around 11:20 a.m., video footage from a Wal-Mart store nearby shows Mays purchasing "Winchester Super X Power Point .30-30 caliber ammunition."  Mays had recently borrowed a .30-30 rifle from his brother, Donald Mays ("Donald"); at the time, Mays told Donald that he was borrowing the rifle for target practice.

At around 12:30 p.m. on March 26, 2012, Jared Lawler, a farmer in Henry County, noticed a field off of Highway 7 had an open gate that was always supposed to be closed, so he stopped to close it.  Mr. Lawler noticed a black Ford Ranger pickup in an adjoining field, so he "knew someone was in there."  No one was inside the truck, so Mr. Lawler "walked around the truck, wrote the license number down, and kind of hung around there for a little bit to see if [he] could see anybody in there hunting."  When Mr. Lawler was about to leave, he "saw a gentleman in the tree line along 7 Highway."  The man (later determined by Mr. Lawler to be Mays) emerged from the tree line, and they "walked together back to the truck."  Mr. Lawler described the man as "an older gentleman, had glasses, had a hat on that said . . . something about being a veteran," and he was wearing "a kind of plaid looking shirt, jeans," carrying a Winchester Model 94 .30-30 rifle.  Mr. Lawler asked the man what he was doing, and the man said he had unsuccessfully been trying to shoot a coyote.  Mr. Lawler introduced himself to the man, and they shook hands.  Mr. Lawler said the man left and turned east toward Highway 7.  Mr. Lawler did not remember the man's name, but identified him as Mays at trial.  Mr. Lawler said the field was located "five to six" miles from County Line Road, which is adjacent to Sky Village.

At "a little before 1 p.m.," Jean Bonrud and her friend, Vicki Schmidt, were at Ms. Bonrud's Sky Village house.  Ms. Bonrud, a nurse, knew Mays but did not know

3

Mr. Romdall. Ms. Bonrud saw a "black small pickup" truck traveling east on Highway 7 by her house and assumed that it was Mays on his way home. Shortly thereafter, the women heard two gunshots close in time. Looking out the window, Ms. Schmidt saw two pickup trucks: a gray one facing north and a black one facing south. She saw the black pickup leave and go south "over a little knoll." The women then saw the black pickup coming back north "at a high speed." After the black pickup left, another man she did not recognize pulled up behind the gray truck, "got out and went up to the pickup and yelled that . . . Rudy's been shot."

Ms. Bonrud walked out to see if she could help. She noticed a bullet hole in the side of the truck's door and saw what proved to be Mr. Romdall "slumped over to the side" in his seat. His driver's side window was rolled down, and a cell phone was open in Mr. Romdall's hand on his leg. The man's wife called 9-1-1 and handed the phone to Ms. Bonrud. Ms. Bonrud told the 9-1-1 dispatcher that Mr. Romdall was non-responsive. She took Mr. Romdall's pulse and noticed he was gasping for breath. He had a hole in his left side with blood streaming out.

The other man on the scene was Ronald Ferguson, a Sky Village neighbor. He had seen Mr. Romdall at around 11:45 a.m. earlier in the day when Mr. Romdall stopped by to see Mr. Ferguson's mother. Later, when he and his family were on their way out of town, he saw Mr. Romdall's truck stopped at the intersection near the edge of the neighborhood. He pulled up behind Mr. Romdall's truck, but after waiting for a while, he pulled up to the side of Mr. Romdall's truck. He noticed a bullet hole by the door handle, so he got out of his car and went to the driver's side of the truck. Mr. Ferguson saw Mr. Romdall slumped over with his cell phone in his hand and his dog next to him. Mr. Ferguson could not feel Mr. Romdall's pulse, and he saw lots of blood. He put Mr. Romdall's truck in park and told his wife to call 9-1-1. Mr. Ferguson did not see any handguns inside the truck's interior.

4

Mr. Romdall died from his injuries.

Later that afternoon, Mays pulled up to the home of Joseph Rhodes, a retired Pentacostal minister. Mr. Rhodes was mowing his grass, but shut the mower off when Mays drove up and exited his truck. Mays, who had never met Rhodes before, asked Rhodes if he was a minister; Mr. Rhodes responded that he was, but was retired. Mays then asked Mr. Rhodes if he was a veteran, and Mr. Rhodes responded that he was. Mays then told Mr. Rhodes that he thought he had killed someone by shooting him with a .30-30 rifle in the chest. Mr. Rhodes agreed that such a gun shot with that weapon would have killed the other person. The two walked up to Mr. Rhodes's porch and Mays told Mr. Rhodes that he and the other man had had troubles for some time, and that the man had been "bugging the fire out of him." Mays subsequently asked to make a phone call with Mr. Rhodes's land line telephone and Mr. Rhodes complied. Mays made some phone calls, told Mr. Rhodes that someone would be coming to pick him up, then went down near the lake behind Mr. Rhodes's house to wait for his ride.

Mays turned himself in to police the next morning, March 27, 2012.

On March 27, 2012, Bryan Bethel, Park Superintendent of the Harry S. Truman State Park was on duty. He had been advised to look for a black Ford Ranger pickup truck with a specific license plate that was wanted in a criminal investigation. Mr. Bethel and a park ranger performed sweeps of the park, looking for the vehicle. Mr. Bethel found the truck at approximately 1:45 p.m., at the park marina, and called the sheriff's office.

As Mr. Bethel waited for law enforcement to show up, he saw a young man with dark hair talking on a cell phone standing at the back of the pickup truck and looking into it. Then a blue car pulled up, and an elderly gentleman with a cowboy hat and a woman got out of the car and began to mill around the truck, looking in the windows and the back of the truck. Next, a

5

silver car appeared and the elderly gentleman and the woman talked to the people in the silver car. The man and the woman looked around the truck once more, and then the elderly gentleman reached into the bed of the pickup and pulled out what appeared to be a brown jacket wrapped around a stiff object about eighteen to twenty inches long. The elderly gentleman and the woman left in the silver car. The younger man on the cell phone went to the houseboat area of the marina.

When Deputy Sheriff Brian Bigler arrived, he met with Mr. Bethel, who took them to the pickup truck. Another deputy sheriff was there with a park ranger. Deputy Bigler was told by the sheriff to seize the pickup truck and tow it to the impound lot. Deputy Bigler got the keys to the truck from Mays's son. Mays's wife's car was also at the marina.

After the truck was recovered, Sergeant Greg Martin of the Highway Patrol drafted an affidavit for a search warrant for the truck. The search warrant was issued and Sgt. Martin executed the warrant on March 29, 2012. The search of the truck did not yield a weapon. It revealed no evidence that a bullet might have been fired into the truck. A green suitcase was found in the truck containing clothing and paperwork.

Before trial, Mays's counsel filed a motion in limine to exclude any testimony regarding any communication Mays had with Mr. Rhodes. Mays also filed a motion to suppress the evidence obtained in the search of the pickup truck since the truck was seized prior to a warrant having been obtained. Both motions were ultimately denied, and the evidence was admitted at Mays's trial. The jury found Mays guilty on all counts.

This appeal follows.

**Clergy-Communicant Privilege**

Mays's first point on appeal is that the trial court erred in admitting the testimony of Mr. Rhodes because he argues that the clergy-communicant privilege in section 491.060(4) applies to Mays's conversation with Mr. Rhodes on the day of Mr. Romdall's homicide.

The trial court has broad discretion in ruling on the admissibility of evidence. *State v. Joyner*, 458 S.W.3d 875, 880 (Mo. App. W.D. 2015). We thus review the trial court's decisions regarding the admission of the evidence for an abuse of that discretion. *Id.* "The trial court abuses its discretion if its ruling is clearly against the logic of the circumstances and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *Id.* The "trial court's admission of evidence will be sustained as long as it is sustainable under any theory." *State v. Merrill*, 990 S.W.2d 166, 170 (Mo. App. W.D. 1999). We view the facts and any reasonable inferences therefrom in the light most favorable to the trial court's evidentiary ruling, *State v. Little*, 473 S.W.3d 662, 666 (Mo. App. E.D. 2015), though the trial court's interpretation of section 491.060 is a question of law that we review *de novo*, *State v. Wadas*, 225 S.W.3d 466, 468 (Mo. App. W.D. 2007).

Even if we conclude that the trial court has erroneously admitted certain evidence, we will not consider such evidence reversible error unless its admission was "so prejudicial that it deprived the defendant of a fair trial." *State v. Ward*, 473 S.W.3d 686, 696 (Mo. App. W.D. 2015). This level of prejudice is established when the error in admitting the evidence was "outcome determinative." *Joyner*, 458 S.W.3d at 880. A "finding of outcome-determinative prejudice expresses a judicial conclusion that the erroneously admitted evidence so influenced the jury that, when considered with and balanced against all of the evidence properly admitted, there is a reasonable probability that the jury would have reached a different conclusion but for

the erroneously admitted evidence." *Id.* (internal quotation omitted).[2] Here, even were we to find error with the trial court's evidentiary ruling relating to the admission of Mr. Rhodes's testimony at trial,[3] there simply is no outcome-determinative prejudice in this case that could warrant reversal.

First, Mr. Rhodes's testimony regarding Mays's admissions to him tends to prove facts that were otherwise already in the case. When there is "other evidence before the court which establishe[s] the same facts," no prejudice is shown. *Merrill*, 990 S.W.2d at 171. *See also Trident Group, LLC v. Miss. Valley Roofing, Inc.*, 279 S.W.3d 192, 199 (Mo. App. E.D. 2009) ("A complaining party is not entitled to assert prejudice if the challenged evidence is cumulative to other related admitted evidence."). Mr. Rhodes testified that Mays appeared upset and that Mays admitted to shooting Mr. Romdall, in the chest, with a .30-30 rifle, and that Mr. Romdall had been "bugging the fire out of him." Mays himself testified that he had been upset the day he shot Mr. Romdall, and that he had to go take a walk to calm down. Mays admitted that he shot

---

[2] Mays's brief asserts that the standard for outcome-determinative prejudice is whether "it can be said beyond a reasonable doubt that the improperly admitted evidence failed to contribute to the jury's verdict." Mays cites *State v. Barton*, 936 S.W.2d 781, 786-87 (Mo. banc 1996). *Barton*, which does not involve erroneously admitted evidence, but examines a trial court's erroneous ruling limiting the defendant's closing argument, does not require a finding of no prejudice "beyond a reasonable doubt." Rather, *Barton* discusses the standard for prejudice at length, and holds expressly that "the proper standard for reversing a case due to an abuse of discretion in closing argument should be stated as whether the abuse 'prejudiced' the defendant's case; that is, whether there is a reasonable probability that, in the absence of the abuse, the verdict would have been different." *Id.* at 786. Though we have found cases that require a finding of a lack of prejudice beyond all reasonable doubt, those cases involve trial court error that affects the defendant's *constitutional* rights; *see, e.g., State v. Driscoll*, 55 S.W.3d 350, 356 (Mo. banc 2001). Here, conversely, the error claimed by Mays on appeal involves a privilege granted by *statute* and his point relied on expresses no claim of constitutional violation by the trial court.

[3] Section 491.060(4) provides that "[a]ny person practicing as a minister of the gospel, priest, rabbi or other person serving in a similar capacity for any organized religion, concerning a communication made to him or her in his or her professional capacity as a spiritual advisor, confessor, counselor or comforter" is incompetent to testify about the privileged communication. Though there are instances where a retired minister could still qualify as a "practicing" minister, whether Mr. Rhodes was a "practicing" minister or not does not dispense with the requirement that the communication by the "communicant" be within the "clergy's" professional capacity as a "spiritual advisor, confessor, counselor or comforter." *See State v. Gerhart*, 129 S.W.3d 893, 898 (Mo. App. W.D. 2004). Here, Mays did not ask for spiritual guidance, prayer, absolution, forgiveness, or anything of the like from Mr. Rhodes—a person whom he had never met before; instead, after confirming that Mr. Rhodes was both a retired pastor *and* a veteran, he explained how he had just shot another person, needed a phone to call someone to pick him up, and then he left. That said, we need not and do not rule upon the correctness of the trial court's evidentiary ruling as to whether the clergy-communicant privilege was applicable or not.

Mr. Romdall (in self-defense), and several witnesses saw a truck that looked like Mays's going up and down the street at the time that they heard gunshots and later found Mr. Romdall in his own truck dying from a gunshot wound. Mays testified that he borrowed his brother's gun, which his brother testified was a Winchester .30-30 rifle, and the surveillance camera at Wal-Mart showed Mays buying ammunition for a .30-30 rifle. Mays testified about his contentious relationship with Mr. Romdall, as did several neighbors. Accordingly, the facts that Mr. Rhodes's testimony tended to prove were also established by other evidence properly admitted at trial.

Next, Mr. Rhodes's testimony was not inconsistent with Mays's theory of the case—that he shot Mr. Romdall in self-defense. Mr. Rhodes did not testify that Mays had admitted that the shooting was premeditated nor of such a nature that he needed forgiveness for his actions. In fact, Mays did not ask Mr. Rhodes to pray for him on the day of the shooting and, likewise, did not ask Mr. Rhodes for any spiritual comfort whatsoever. Rhodes's account was that Mays simply appeared at his home, asked if he was a minister, asked if he was a veteran, admitted to shooting another man with a .30-30 rifle, stated that this other man had been bothering him to an extreme level, and then asked him to use the telephone. None of this is inconsistent with Mays's theory of the case, that Mr. Romdall, who had been severely bothering him for some time, and by whom he felt physically threatened for his life, appeared to have a gun on March 26, 2012, while he was in his truck, that Mr. Romdall shot at Mays, and that Mays shot Mr. Romdall in self-defense. "As such, the [testimony] at issue, here, would not seem to lend any greater weight to the State's theory of the case than it would the defense theory." *State v. Tripp*, 168 S.W.3d 667, 679 (Mo. App. W.D. 2005). This weighs against a finding that the testimony in question caused prejudice warranting reversal. *Id.*

9

Finally, even if we view the record without Mr. Rhodes's testimony, the overwhelming evidence in this case supported the jury's finding of guilt. Several witnesses testified that Mays and Mr. Romdall had a history of conflict, and some neighbors testified that Mays had threatened to kill Mr. Romdall, although they did not take his threats seriously. Ms. Simmons testified that on the day of the shooting, Mays was behaving aggressively and followed Mr. Romdall. Ms. Simmons, who was with Mr. Romdall, was frightened, and Mays's behavior caused the police to be called by another neighbor. Mays testified that he was so upset after confronting Mr. Romdall and Ms. Simmons that he had to go walk around to calm down. Mays testified that he later went to borrow his brother's gun, ostensibly for "target practice." Wal-Mart surveillance footage shows Mays buying ammunition for his brother's gun. Immediately before the shooting, several witnesses testified to seeing a truck matching the description of Mays's truck driving down the road near where the shooting occurred. Several witnesses heard gunshots, and Vicki Schmidt and Jean Bonrud saw the black truck, which Ms. Bonrud believed belonged to Mays, speed off away from the scene of the shooting. There was no weapon in Romdall's truck; there was only a cell phone in his hand.

The next day, Mays turned himself in to police, and his truck was found at the marina near Truman Lake. No weapon was found in Mays's truck, despite his admission that he shot Mr. Romdall with his brother's .30-30 rifle. There was also no evidence in Mays's truck that a bullet had been fired at it, although Mays had claimed that Mr. Romdall shot at him.

Considering Mr. Rhodes's testimony, when balanced against all of the evidence properly admitted at trial, we conclude that there is not a reasonable probability that the jury would have reached a different conclusion but for Mr. Rhodes's testimony, even were we to conclude that it had been erroneously admitted. Accordingly, Mays cannot demonstrate that the admission of

10

Mr. Rhodes's testimony at trial was so prejudicial as to deprive him of a fair trial and, hence, Mays has failed to point to error warranting reversal.

Point I is denied.

### Evidence Obtained from Warrantless Seizure of Truck

Mays's second point on appeal is that the trial court erred in denying his motion to suppress evidence taken from his truck on March 27, 2012, the day following Mr. Romdall's shooting. The truck was *seized* by police without a warrant, but a warrant was obtained *before* the truck was *searched*.

When a motion to suppress is denied, we review both the evidence presented at the motion hearing and at the trial, and view the facts and reasonable inferences from those facts in the light most favorable to the trial court's ruling. *State v. Selvy*, 462 S.W.3d 756, 760 (Mo. App. E.D. 2015). "Review is limited to determining whether the decision is supported by substantial evidence." *State v. Walker*, 460 S.W.3d 81, 85 (Mo. App. W.D. 2015). However, analysis of whether the Fourth Amendment has been violated is a legal issue that this court reviews *de novo*. *Id.*

The Fourth Amendment to the United States Constitution and article 1, section 15 of the Missouri Constitution both guarantee the right of people to be free from unreasonable searches and seizures. *State v. Humble*, 474 S.W.3d 210, 215 (Mo. App. W.D. 2015). A warrantless search or seizure is presumed to be unreasonable unless one of "a few specifically established and well-delineated exceptions" applies. *Id.* (internal quotation omitted). The "automobile exception" is one of those established exceptions to the warrant requirement. *Id.*

"Under the automobile exception to the warrant requirement, police may search a vehicle and seize [evidence] found if there is probable cause to believe that the vehicle contains

11

[evidence] and exigent circumstances necessitate the search." *Walker*, 460 S.W.3d at 85 (internal quotation omitted). Here, there was both probable cause to believe that evidence relevant to the homicide would be found in the truck and that exigent circumstances required that the truck be seized to prevent further removal of evidence from the truck.

Several witnesses had seen Mays argue with and harass Mr. Romdall on the day of his death and had seen a vehicle that looked like the one Mays drove in the area of Mr. Romdall's own vehicle immediately prior to the shooting, a location where witnesses had heard multiple gun shots fired. Further, Mays had turned himself in to law enforcement the morning before his truck was impounded. Therefore, the black truck that law enforcement believed belonged to Mays—substantiated by the fact that the keys to the truck were provided by Mays's brother— was part of the crime scene; thus, the officers had probable cause to believe that evidence of the crime would be found within the truck.

Likewise, exigent circumstances supported law enforcement's *seizure* of the pickup truck to a secured location while a *search* warrant was being obtained. The truck was clearly mobile and had been moved in the few hours preceding its seizure. And, in mere minutes between Park Superintendent Bethel's discovery of the vehicle and law enforcement's arrival, Mr. Bethel observed several people milling about the truck and conversing amongst each other, coming and going, and one of the people removing at least one item from the bed of the truck that appeared to be something matching the description of a wrapped up weapon. These exigent circumstances justified law enforcement's preemptive seizure of the truck to a secure location where it could be searched later, pursuant to the warrant that law enforcement obtained.

The trial court did not commit error in admitting the evidence found in the pickup truck.

Point II is denied.

12

## Conclusion

The judgment of the trial court is affirmed.

_____
Mark D. Pfeiffer, Chief Judge

Alok Ahuja, Presiding Judge, and J. Dale Youngs, Special Judge, concur.