STATE of Missouri, Respondent,

v.

**Corey D. BARRETT, Appellant.**

**WD 78815**

Missouri Court of Appeals,
Western District.

OPINION FILED: February 28, 2017

Motion for Rehearing and/or Transfer to Supreme Court Denied March 28, 2017.

---

Joshua D. Hawley, Attorney General, Richard A. Starnes, Assistant Attorney General, Jefferson City, MO, Attorneys for Respondent.

Jeannette L. Wolpink, Appellate Defender, Kansas City, MO, Attorney for Appellant.

Before Division IV: Mark D. Pfeiffer, Chief Judge, and Thomas H. Newton and Lisa White Hardwick, Judges

Mark D. Pfeiffer, Chief Judge

Mr. Corey D. Barrett ("Barrett") was convicted in the Circuit Court of Jackson County ("trial court") of one count second-

degree felony murder, one count first-degree burglary, one count first-degree robbery, and two counts armed criminal action. On appeal, Barrett contends that the trial court erred in admitting into evidence the statement he gave to police after his arrest because it was not voluntarily made. Barrett also contends that there was insufficient evidence to support his convictions for robbery and related armed criminal action. We affirm.

### Factual and Procedural Background [1]

In March 2013, Barrett was charged with one count second-degree felony murder, § 565.021; one count first-degree burglary, § 569.160; one count first-degree robbery, § 569.020; and two counts armed criminal action, § 571.015.[2] Barrett, a sixteen-year-old at the time of the crimes, had been primarily raised by his maternal grandmother, Marise Barrett ("Victim"), and her husband, Vernon C. Barrett ("Grandfather").[3] Barrett's biological mother is Tameka Barrett ("Mother"), who was largely absent for most of her son's life.

Sometime around Christmas 2012, Victim kicked Barrett out of her house over a dispute about a phone bill. Barrett subsequently moved into a teen homeless shelter called "reStart." On March 16, 2013, Barrett told a fellow reStart resident named Kevin Brewer ("Brewer") that Victim had valuables in her home, and he proposed that the two break into her house to steal them. They left the shelter that evening around midnight and walked five miles to Victim's house in order to carry out their planned theft.

Barrett led Brewer to Victim's house and broke a window in the attached garage so that they could access the main part of the house. A short time later, they left with Victim's iPhone. Barrett testified that Brewer had blood on his hands when they left the house. Barrett had a cut on his arm and blood on his jeans.

Barrett and Brewer returned to reStart at 4:50 a.m. where they immediately went to the bathroom. Barrett was bleeding from the cut on his arm and asked the night worker for a Band–Aid. Shortly afterwards, both boys were discharged from reStart for leaving the shelter at night in violation of the rules.

Barrett went to Psychiatric Research Center where he reported having thoughts of suicide. During his intake, a caseworker at the center washed Barrett's clothes and noticed the blood on his pants. When making inquiry with Barrett, Barrett told the caseworker that he was in trouble and that no one could help him. Mother called Barrett later in the morning to report that Victim had been brutally murdered. Barrett responded with little emotion and asked Mother to come pick him up at the psychiatric center.

Around the same time Barrett presented to Psychiatric Research Center, Victim was found dead in her bed, the result of 32 stab wounds. The window to the attached garage was broken, her iPhone was missing, and a knife covered in blood was found below her on the floor. The missing iPhone

---

1. We view and present the facts in the light most favorable to the trial court's ruling. *State v. Woodrome*, 407 S.W.3d 702, 706 (Mo. App. W.D. 2013).

2. All statutory citations refer to the Revised Statutes of Missouri 2000, as supplemented, unless otherwise indicated.

3. Barrett was initially charged as a juvenile due to his age at the time of the crimes, but he was ultimately tried as an adult after being certified as an adult.

was soon traced to Brewer, who had been using it after its disappearance from Victim's house. Subsequent testing revealed that Barrett's fingerprints were on the glass of the broken window.

On March 18, the police tracked the missing iPhone to Brewer's high school; he was arrested when police found the stolen phone in his possession. On March 19, police found Barrett at the psychiatric center and also arrested him in connection with the crime.

Police officers interviewed Barrett on March 20. Because Barrett was then a minor, police brought Mother to the interrogation. A deputy juvenile officer was also present. The interviewing officers informed Barrett of his *Miranda* rights and requested that he sign a related waiver form so that they could speak with him; in reply, Barrett indicated that he understood his rights and did not wish to speak with the police. After subsequent conversation between Mother and the officers in which they explained that they could not speak with Barrett absent his waiver, Mother indicated her desire to speak privately with Barrett; the officers permitted Mother to do so, after which Barrett indicated that he had changed his mind and agreed to sign the *Miranda* waiver and speak with the officers.

During the following interview, Barrett did not confess to murdering Victim but admitted that he and Brewer had planned to break into Victim's house with the intent to steal from her. Barrett said that he had gone into the main part of the house briefly, but he then "chickened out" and returned to the garage while Brewer remained in the house. He expressed a belief that Brewer was the person who had killed Victim because Brewer had blood on his hands after coming out of the house.

At some point, Barrett also had a separate conversation with Mother in which he admitted that he had fully entered the house. He also wrote a letter to Mother while he was awaiting trial in which he described a dream with a boy in a garage and another boy in a house and a woman screaming, "What is wrong with you!"

Before his bench trial, Barrett moved to suppress the statements he made to police. In the motion, Barrett contended that all statements made after his initial refusal to speak with police were involuntary because he was improperly coerced into speaking and waiving his rights by Mother, who he claimed was acting as an agent of the police. At the hearing on his suppression motion, two of the officers who had participated in Barrett's interrogation testified regarding their interactions with Barrett and Mother. Both officers stated that—while they had certainly explained the interrogation process and Barrett's *Miranda* rights to Mother—at no point did they ask or coach her to solicit Barrett's participation in the interrogation. The trial court found the officers' testimony credible, denied Barrett's motion to suppress, and permitted his statements to police to be admitted at trial.

Barrett testified in his own defense during his trial. His testimony was that he did break into Victim's garage with Brewer, but he did not intend to commit any crimes inside the house, and Brewer was the only person who went into Victim's house. He also testified that he did not commit any of the alleged crimes inside the home.

Barrett was found guilty as charged. The trial court sentenced him to life imprisonment for the felony murder and related armed criminal action, fifteen years' imprisonment for first-degree burglary, and twenty-five years' imprisonment for the first-degree robbery and related armed criminal action (with all terms to be served concurrently).

Barrett appeals.

## Analysis

### I. Voluntariness of Barrett's Statement to Police

In Barrett's first point on appeal, he contends that the trial court erred in failing to suppress his statements to police because they were not made voluntarily. Specifically, Barrett argues that he unequivocally invoked his right to remain silent, but then Mother (who he claims was acting as an agent of the police) coerced him into waiving his rights, thereby rendering his waiver and subsequent statements involuntary.[4] For the reasons outlined below, we disagree.

### *Standard of Review*

In reviewing the trial court's denial of a motion to suppress, we are limited to determining "whether the decision is supported by substantial evidence, and it will be reversed only if clearly erroneous." *State v. Lovelady*, 432 S.W.3d 187, 190 (Mo. banc 2014); *see also State v. Woodrome*, 407 S.W.3d 702, 706 (Mo. App. W.D. 2013). The trial court's ruling is clearly erroneous if we are left with a definite and firm impression that a mistake was made. *State v. Humble*, 474 S.W.3d 210, 214 (Mo. App. W.D. 2015). We view all evidence elicited at both the suppression hearing and trial, and the reasonable inferences rising therefrom, in the light most favorable to the trial court's ruling. *State v. Edwards*, 116 S.W.3d 511, 530 (Mo. banc 2003). "[C]ontrary evidence and inferences are disregarded." *State v. Norfolk*, 366 S.W.3d 528, 531 (Mo. banc 2012) (internal quotation omitted). We defer to the trial court's factual findings and credibility de-

terminations, but we review questions of law *de novo. Id.*

### *Analysis*

"After an individual has been advised of his *Miranda* rights, no statement he makes may be used against him unless he makes a knowing, intelligent, understanding, and voluntary waiver of those rights." *State v. Corpier*, 793 S.W.2d 430, 440 (Mo. App. W.D. 1990). "Once the right to remain silent is waived, the waiver continues unless the right is affirmatively invoked by the defendant." *Id.* Accordingly, when a defendant challenges the admissibility of a statement on grounds that it was involuntary, the State bears the burden of showing voluntariness by a preponderance of the evidence. *State v. Johnson*, 207 S.W.3d 24, 45 (Mo. banc 2006).

Determining whether a defendant's statement was made "voluntarily" requires a consideration of all the circumstances in which the statement was made:

> The test for voluntariness is whether, under the totality of the circumstances, the defendant was deprived of free choice to admit, to deny, or to refuse to answer and whether physical or psychological coercion was of such a degree that the defendant's will was overborne at the time he confessed. Factors that are considered include whether the defendant was advised of his rights and understood them, the defendant's physical and mental state, the length of questioning, the presence of police coercion or intimidation, and the withholding of physical needs. Evidence of the defendant's physical or emotional condition

---

4. Although the language of Barrett's first point challenges the "voluntary, knowing, and intelligent" nature of his statements to police, his argument in Point I challenges its voluntariness only. We therefore focus our analysis of Point I on the voluntariness of his state-ment and do not discuss whether it was "knowingly and intelligently" made. *See State v. Muhammad*, 478 S.W.3d 468, 474 (Mo. App. W.D. 2015) (failure of appellant's argument to address claim made in Point Relied On results in abandonment of the claim).

alone, absent evidence of police coercion, is insufficient to demonstrate that the confession was involuntary.

*Id.* (internal citations omitted) (internal quotations omitted). "Although juveniles may voluntarily waive their rights, courts emphasize that a juvenile's confession requires special caution. The juvenile's age is not a controlling factor, but it is a significant consideration among the totality of the circumstances." *State v. Greer*, 159 S.W.3d 451, 458 (Mo. App. E.D. 2005) (internal citation omitted) (internal quotations omitted).

 Viewed in the light most favorable to the trial court's ruling, the totality of the circumstances here show that Barrett's waiver was voluntarily made, even in light of his age. The facts surrounding his statement are as follows.

Upon being taken to the interrogation room, Barrett was advised of his rights both orally and in writing. The rights communicated to Barrett included not only the general *Miranda* warnings, but also a recitation of the additional statutory rights prescribed for juveniles.[5] Mother was present for the entire conversation regarding Barrett's *Miranda* and statutory rights as was a deputy juvenile officer. After Barrett indicated that he did not want to make a statement, the officers ended the interview and explained to Mother that they could not continue the interview without Barrett's waiver of his right to remain silent. The officers did not compel Mother to speak with Barrett privately in an effort to obtain Barrett's waiver of rights; nor did they coach her on what to say after she decided she wished to speak with Barrett in private. After Mother spoke with Barrett in private, however, Barrett indicated his decision to reinitiate conversation with the officers and thereby waived his right to remain silent.

Regarding Barrett's understanding of his rights, he indicated that he understood both verbally and in writing on the waiver form. He further demonstrated his understanding of the right to remain silent by initially refusing to speak with the officers. Regarding Barrett's mental state during the interview, both Barrett and an interviewing officer testified that Barrett was largely unemotional during the interview, with Barrett himself stating, "I don't break that easy." There was no dispute that Barrett responded to questions appropriately and seemed to understand what was happening. Regarding the length of questioning, Barrett's interrogation was not unduly long—only approximately two hours. Barrett makes no claim regarding the withholding of physical needs during his interview. None of these facts contradict the trial court's determination that Barrett's statement was made voluntarily.

 Regarding the presence of police coercion, Barrett argues that the officers "manipulated [him] through the coercive and continued presence of his abusive and neglectful[6] mother." However, al-

---

**5.** Regarding statements made by juveniles ("children"), section 211.059 requires that law enforcement officers must advise the juvenile of the following rights:

(1) That he has the right to remain silent; and

(2) That any statement he does make to anyone can be and may be used against him; and

(3) That he has a right to have a parent, guardian or custodian present during questioning; and

(4) That he has a right to consult with an attorney and that one will be appointed and paid for him if he cannot afford one.

§ 211.059.1. Additionally, if the juvenile indicates that he does not wish to be questioned further at any stage of an interrogation, officers must cease questioning. § 211.059.2.

**6.** We note that Missouri law does not require

though the presence of a parent during a minor's interrogation is generally assumed to be "friendly" in the sense that it is aimed at helping the juvenile avoid prosecution, "[t]he juvenile is not ... entitled to get any particular advice from the [parent]." *State v. Greer*, 159 S.W.3d 451, 459 (Mo. App. E.D. 2005). Our courts have explained that even an unhelpful or actively unwilling parent [7] is not necessarily "unfriendly" to the juvenile's interest during an interrogation, nor does such an attitude render a juvenile defendant's statement involuntary, so long as the parent "is present during the reading of rights and questioning and is not antagonistic to the child's interest, such that the juvenile could look to that person for advice." *Id.* In the present case, there was no evidence presented to show that Barrett's mother was unwilling to participate in his interrogation, nor that she was even unhelpful to Barrett or the police during his interrogation. The extent of the evidence presented regarding Mother's role in Barrett's interrogation was that she was present during

the reading and explanation of his rights, she was permitted to confer with him privately outside of police presence, and then Barrett chose to waive his rights. There was no evidence presented to show that Mother actually was antagonistic to Barrett's interests, nor that Barrett himself viewed her as antagonistic to his interests. In fact, it was Barrett that asked Mother to pick him up at the psychiatric center when she called him to report Victim's murder.

Furthermore, Missouri courts have held that even an adult who actively advises a juvenile to speak with the police is not "unfriendly" to the juvenile's interest so long as the adult has some prior relationship with the juvenile and she is not antagonistic or adverse to the juvenile's interest. *See id.* at 460. Such advice is not deemed coercion so long as the police do not coach or induce the adult to talk to the juvenile for the purpose of convincing the juvenile to waive his rights. *See, e.g., State v. Goforth*, 881 S.W.2d 256 (Mo. App. S.D. 1994).[8] In the present case, there was no

a close familial relationship for someone to be considered a "friendly adult" capable of providing advice to a juvenile defendant: a "friendly adult" can be any adult with some relationship to the juvenile such that the adult can "offer the child meaningful advice or concerned help should the need arise[,]" and who "is not antagonistic or adverse to the juvenile." *State v. Greer*, 159 S.W.3d 451, 460 (Mo. App. E.D. 2005) (internal quotations omitted). Even someone who is closely related to a juvenile's alleged murder victim can be considered a "friendly adult" where the juvenile believes that person to be friendly towards him and there is no apparent hostility between the juvenile and the adult. *See id.* (juvenile accused of murdering his mother and attempting to murder his father was not coerced by presence of uncle during interrogation where juvenile believed uncle to be friendly and uncle was not antagonistic towards or adverse to juvenile's interest).

7. For example, in *State v. Barnaby*, the juvenile defendant argued that his confession was

involuntary because, although his mother was present during the interrogation, she was not "friendly" because she did nothing to protect his rights and she expressed unwillingness to participate in the interrogation. 950 S.W.2d 1, 3 (Mo. App. W.D. 1997). The appellate court found that the mother's presence did not render the juvenile's confession involuntary where the mother was present when police advised the juvenile of his rights, the officers did nothing to exclude the mother from the interrogation, and nothing in the record indicated that the juvenile was precluded from conferring with his mother. *Id.* at 4. Accordingly, it was irrelevant that the mother did not actually provide the juvenile with any advice; "[r]ather, it [was] the *opportunity* for the juvenile and adult to confer that [was] critical." *Greer*, 159 S.W.3d at 460.

8. In *State v. Goforth*, the juvenile defendant argued that his confession was involuntary because his father advised him to speak with police after being coached to do so by several

evidence presented to show that Barrett's mother coerced or convinced him to speak with the police as a result of police inducement. The testimony before the trial court was that the officers told Mother they could not speak with Barrett unless he affirmatively waived his rights; then, Mother decided she wished to confer with Barrett privately and she was permitted to do so. There was no testimony showing that the officers induced or coached Mother into advising Barrett to speak with them, nor that they asked her to solicit Barrett's cooperation. There is simply no evidence to show that Mother's presence during Barrett's interrogation "deprived [him] of a free choice to admit, deny, or refuse to answer questions" nor that Mother or the officers exerted "psychological coercion to such a degree that [Barrett's] will was overborne at the time he made the statement." *State v. Barnaby*, 950 S.W.2d 1, 4 (Mo. App. W.D. 1997).

Although Barrett claims that the presence of Mother "detracted from the voluntariness of his choice" to speak with police, it is clear that the trial court determined the testimony of the officers to be credible in showing that Barrett was not coerced by Mother's presence during interrogation, and in showing that police did not induce or coach Mother to solicit Barrett's waiver of rights. "[W]e defer to the trial court's . . . credibility determinations[,]" and the record supports a conclusion that Mother was not antagonistic towards or adverse to Barrett's interest. *Greer*, 159 S.W.3d at 460–61.

The totality of the circumstances surrounding Barrett's interrogation demonstrates that Barrett knowingly and intelligently waived his rights and spoke with police voluntarily. The trial court's ruling denying Barrett's motion to suppress was not clearly erroneous.[9]

officers. 881 S.W.2d 256, 262 (Mo. App. S.D. 1994). However, the appellate court found that the father's advice did not render the juvenile's subsequent confession involuntary where the father and son were allowed to speak privately (*i.e.*, not in the presence of police) and the police did not induce the father into giving such advice with promises of leniency or other inducement. *Id.* at 262–63.

9. Furthermore, "[e]ven if we conclude that the trial court has erroneously admitted certain evidence, we will not consider such evidence reversible error unless its admission was so prejudicial that it deprived the defendant of a fair trial." *State v. Mays*, 501 S.W.3d 484, 489 (Mo. App. W.D. 2016) (internal quotation omitted). "This level of prejudice is established when the error in admitting the evidence was outcome determinative." *Id.* (internal quotation omitted). "A finding of outcome-determinative prejudice expresses a judicial conclusion that the erroneously admitted evidence so influenced the jury that, when considered with and balanced against all of the evidence properly admitted, there is a reasonable probability

that the jury would have reached a different conclusion but for the erroneously admitted evidence." *Id.* (internal quotation omitted). In the present case, "even were we to find error with the trial court's evidentiary ruling relating to the admission of [Barrett's statements] at trial, there simply is no outcome-determinative prejudice in this case that could warrant reversal." *Id.* (footnote omitted).

Barrett's statements during interrogation (*i.e.*, that he and Brewer went to Victim's house intending to steal from her and broke into her house) tended to prove facts that were otherwise already in the case. "When there is other evidence before the court which establishe[s] the same facts, no prejudice is shown." *Id.* at 490 (internal quotation omitted). Here, Barrett himself admitted at trial that he and Brewer went to Victim's house intending to steal from her and he broke into the home with that intent. Barrett's illicit presence in Victim's home that night was also established via his fingerprints found on the glass of the broken garage window.

And, even if we view the record without Barrett's statement to police, the evidence in this case supported the trial court's finding of

Point I is denied.

## II. Sufficient Evidence to Support Convictions

In his second point on appeal, Barrett contends that the trial court erred in denying his motion for acquittal and in sentencing him because the State's evidence was insufficient to support his conviction for first-degree robbery in that the evidence did not sufficiently prove that he (or his co-actor) "forcibly stole" Victim's cell phone, nor that Victim's murder was committed "for the purpose of" stealing the phone.[10] He further argues that, because the State did not sufficiently prove the robbery charge, it also did not prove the related armed criminal action charge because that charge does not lie without an accompanying felony conviction. For the reasons outlined below, we disagree that the robbery conviction is not supported by sufficient evidence.

### Standard of Review

On appeal, our review "is limited to determining whether there was sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt." *State v. Miller*, 372 S.W.3d 455, 463 (Mo. banc 2012) (internal quotation omitted). "The State may prove its case by presenting either direct or circumstantial evidence connecting the defendant to each element of the crime." *State v. Howell*, 143 S.W.3d 747, 752 (Mo. App. W.D. 2004).

"The evidence and all reasonable inferences therefrom are viewed in the light most favorable to the verdict, disregarding any evidence and inferences contrary to the verdict." *Miller*, 372 S.W.3d at 463 (internal quotation omitted). This is not an assessment of whether we believe "that the evidence at trial established guilt beyond a reasonable doubt but rather a question of whether, in light of the evidence most favorable to the State, any rational fact-finder could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (internal quotation omitted). We employ this standard in reviewing all evidence—direct as well as circumstantial—in order to determine whether the State presented evidence sufficient to allow submission to the jury. *State v. Davis*, 797 S.W.2d 560, 563 (Mo. App. W.D. 1990).

guilt. Barrett admitted to entering Victim's house with the intent to steal from her, showing his active participation in the planning and commission of the crime. Brewer was found with Victim's cell phone, showing that the two actually did steal from Victim's house. Upon returning to the teen shelter, Barrett requested a Band–Aid from a counselor since he was bleeding from a cut on his arm and staff at the psychiatric center observed blood on Barrett's clothing when he went to the center the morning after the robbery and Victim's murder; these facts could lead a reasonable fact-finder to conclude that he had been present and/or involved with Victim's murder. Similarly, Barrett expressed suicidal thoughts and told a worker at the psychiatric center that he was in trouble but people at the center could not help him, which could also lead a reasonable fact-finder to conclude that he was expressing guilty feelings for murdering the person that had raised him. Finally, Barrett told Mother in a letter that he dreamed he was at the scene of the murder and heard a woman screaming, "What is wrong with you," which a reasonable fact-finder could believe tended to show that Barrett likely observed or participated in Victim's murder.

Simply put, Barrett cannot demonstrate any outcome-determinative prejudice in his claim of error on appeal relating to his statement to police officers.

10. Barrett was charged with first-degree robbery pursuant to section 569.020, RSMo 2000. However, the crime of first-degree robbery was transferred to section 570.023 in 2014, effective January 1, 2017. The texts of these alternate versions are essentially identical but for a minor substitution and insertions.

"When the record contains facts supporting conflicting inferences, we presume that the trier of fact resolved any such conflicts in favor of the prosecution, and [we] must defer to that resolution." *State v. Rinehart*, 383 S.W.3d 95, 100 (Mo. App. W.D. 2012) (internal quotation omitted). "The fact-finder may believe all, some, or none of the testimony of a witness when considered with the facts, circumstances and other testimony in the case. We defer to the superior position of the jury to assess the credibility of witnesses and the weight and value of their testimony." *Id.* (internal citation omitted) (internal quotation omitted).

## Analysis

In the present case, the State charged Barrett with first-degree robbery and submitted that charge to the trial court on a theory of accomplice liability. Under this theory, the State was required to prove that Barrett aided, abetted, or participated in the robbery committed by Brewer, his co-actor. Missouri makes no distinctions between principal and accomplice liability; therefore, all who act in concert to commit a crime are guilty of that crime. *State v. Wurtzberger*, 40 S.W.3d 893, 895 (Mo. banc 2001).

A conviction for first-degree robbery requires the State to show that the defendant forcibly stole another person's property and, in the course of doing so, caused serious physical injury to that person by the use or threatened use of an actual or apparent deadly weapon. § 569.020.1. To prove that a "forcible stealing" occurred, the State must show that the defendant threatened the immediate use of physical force upon the victim for the purpose of

compelling her to acquiesce to the theft. § 569.010(1).[11]

■■■■■■ "As used in the context of forcible stealing, 'in the course of' is a broad term, covering the whole transaction." *State v. Weems*, 840 S.W.2d 222, 228 (Mo. banc 1992). "So long as the fear or violence precedes or is contemporaneous with the taking, the offense of robbery is complete." *Id.* Property taken "in the course of" a robbery need not be taken from the immediate physical presence of the victim and it is not essential that the victim be aware of the robbery if force is used to render her unaware of the taking. *See State v. Meyer*, 694 S.W.2d 853, 855 (Mo. App. E.D. 1985) ("Property does not have to be taken from the immediate physical presence of the victim in order to constitute robbery, and the fact the victim was unaware of the robbery does not make defendant's actions any less serious when force was used to render her unaware of that taking.") (internal citation omitted); *State v. Workes*, 689 S.W.2d 782, 784 (Mo. App. E.D. 1985) (conviction for robbery does not require that property be taken from the immediate physical presence of victim, that the force or threat of force immediately accompany the taking, nor that victim be aware of the robbery if force is utilized to render her unaware of the taking).

■■■■■■ To convict a defendant of first-degree robbery under an accomplice liability theory, the State need not provide direct evidence of the defendant's participation in the robbery; rather, the defendant's guilt is established if, "from the facts and circumstances shown the jury could reasonably find that the defendant was present, aided, abetted, encouraged or participated in the plan or action of the

---

11. Section 569.010, RSMo 2000, was also amended in 2014. The current text of section 570.010, effective January 1, 2017, does not include this definition of the phrase "forcibly steals."

robbery and the events thereafter." *State v. Hatten*, 561 S.W.2d 706, 711 (Mo. App. 1978). The defendant may be considered to have aided and abetted a crime where there is proof in any form that he affirmatively participated in the crime, even if the evidence does not establish the defendant's specific knowledge of which particular crime his co-participant will commit. *See State v. Robinson*, 196 S.W.3d 567, 570 (Mo. App. S.D. 2006). "To convict [defendant] under an accomplice liability theory, the State was required to prove the commission of all elements of the crime by a principal, with 'affirmative participation' by [defendant] to aid the principal in the commission of the crime." *State v. Parsons*, 152 S.W.3d 898, 903 (Mo. App. W.D. 2005). "Any evidence, either direct or circumstantial, that shows 'affirmative participation' in aiding the principal to commit the crime is sufficient to support a conviction[,]" and the defendant's "affirmative participation" may be satisfied by inference. *Id.* "A defendant's presence at the scene [of the crime,] ... his companionship [with a co-actor,] and [his] conduct before and after the offense are circumstances from which one's participation in the crime may be inferred." *State v. McGowan*, 789 S.W.2d 242, 243 (Mo. App. W.D. 1990). A defendant's participation in the crime may also be inferred by his "conduct before and after the offense that tends to show a consciousness of guilt by reason of a desire to conceal the offense or [his] role therein[,]" as well as his attempts to deceive the police. *Parsons*, 152 S.W.3d at 903 (internal quotations omitted). "Although isolated facts viewed individually may not support more than a suspicion of guilt, ... a conviction may rest upon accumulated, inter-dependent facts, no one of which may create more than a suspicion of guilt." *Id.* at 905 (internal quotation omitted).

In the present case, Barrett's affirmative participation in the forcible stealing of Victim's cell phone may be inferred from the following evidence:

- Both during his police interview and at trial, Barrett admitted to unlawfully entering Victim's house with Brewer in order to steal from Victim (and his fingerprints were on the glass of the broken window used to gain access to Victim's property), thereby demonstrating his presence at the scene and his association with Brewer, specifically for the purpose of committing a crime.

- Barrett admitted to fleeing the scene of the crime with Brewer and to spending time with him after the robbery, thereby demonstrating his continued association with the co-participant in the planned crime.

- Brewer was found with Victim's iPhone after the robbery, thereby demonstrating that a theft from Victim's home actually occurred.

- Barrett admitted to advising Brewer that Victim regularly stayed up late, and he stated that the television in Victim's room was on when the two broke in, supporting the reasonable inference that Victim was awake during the burglary and therefore saw the robber or robbers in her house.

- Victim was murdered on the night of the robbery, which could lead a reasonable fact-finder to conclude that force was used against Victim "in the course of" the robbery because:

 - Victim was seen alive several hours before the robbery and was found dead the next morning;

 - Victim's body bore numerous defensive wounds and she did not stab herself to death; and

 - Barrett testified that Brewer was in Victim's house alone for several

minutes, after which he returned to the garage with Victim's cell phone and bloody hands.

- When Barrett went to the psychiatric center the morning after the robbery and Victim's murder, staff at the psychiatric center observed blood on Barrett's clothing, which could lead a reasonable fact-finder to conclude that he had been present and/or involved with Victim's murder and the theft of her cell phone.

- Similarly, after expressing suicidal thoughts very shortly after Victim's brutal murder, Barrett told a caseworker at the center that he was in trouble and people at the center could not help him, which could also lead a reasonable fact-finder to conclude that he had been present and/or involved with the murder and robbery and his comments were expressions of a guilty conscience.

- Barrett told Mother in a letter that he dreamed he was at the scene of the murder and heard a woman screaming, "What is wrong with you!" The fact-finder could reasonably have believed that this was an admission by Barrett which circumstantially tended to show that he observed or participated in Victim's murder and any forcible taking of her property which occurred before or contemporaneous to the murder.

The totality of these circumstances constitutes sufficient evidence to support a conviction for first-degree robbery and related armed criminal action under a theory of accomplice liability. *See id.* It shows that Barrett affirmatively associated himself with Brewer by planning to steal from Victim's house; that the two men actually entered Victim's home with the intent to commit a robbery; that Brewer and/or Barrett were likely caught in the house by

Victim; and that deadly force was used against Victim to perpetrate the robbery.

Point II is denied.

## Conclusion

For the reasons set forth above, we affirm the trial court's judgment.

Thomas H. Newton and Lisa White Hardwick, Judges, concur.